## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**DEBRA CREIGHTON, VALERIE OKUNAMI, AMBER MOORE, and KIRSTEN GOHSLER,**

**Plaintiffs,**

**v.**

**KAFENE, INC. and JUSTWORKS EMPLOYMENT GROUP, LLC,**

**Defendants.**

_____/

**Case No. 1:23-cv-3283**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COME NOW Plaintiffs Debra Creighton ("Creighton"), Valerie Okunami ("Okunami"), Amber Moore ("Moore"), and Kirsten Gohsler ("Gohsler")(collectively, the "Plaintiffs"), by and through undersigned counsel, and bring this Complaint and Demand for Jury Trial against the Defendants, Kafene, Inc. ("Kafene") and JustWorks Employment Group, LLC ("JustWorks")(collectively "Defendants"), and state as follows:

### PARTIES

1.      Plaintiff Creighton is an individual over 18 years of age and is *sui juris*.

2.      Creighton is and was at all relevant times a resident of and domiciled in the state of Florida.

3.      Plaintiff Okunami is an individual over 18 years of age and is *sui juris*.

4.      Okunami is and was at all relevant times a resident of and domiciled in the state of California.

5.      Plaintiff Moore is an individual over 18 years of age and is *sui juris*.

6.      Moore is and was at all relevant times a resident of and domiciled in the state of Illinois.

7.    Plaintiff Gohsler is an individual over 18 years of age and is *sui juris*.

8.    Gohsler is and was at all relevant times a resident of and domiciled in the state of North Carolina.

9.    Kafene's principal place of business is located at 377 Park Avenue South, 7th Floor, New York, New York 10016.

10.    JustWorks' principal place of business is located at 55 Water Street, 29th Floor, New York, New York 10041.

11.    JustWorks' has one managing member, "JustWorks, Inc.", whose principal place of business is located at 55 Water Street, 29th Floor, New York, New York 10041.

## JURISDICTION AND VENUE

12.    This is an action under Federal and state laws, including, but not limited to Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Equal Pay Act of 1963 ("EPA").

13.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

14.    Additionally, as the acts and omissions giving rise to the various state law claims arise from the same nexus of operative facts, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.    There is complete diversity among the Parties, in that the Plaintiffs are residents of and domiciled in Florida, California, Illinois, and North Carolina, while the Defendants are residents of and domiciled in New York.

16.    There is more than $75,000 in controversy, exclusive of attorney's fees, costs, and interest.

17.     Thus, to the extent necessary for this Court to maintain jurisdiction over any and all claims alleged, this Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

18.     Venue is proper in the United States District Court, Southern District of New York, pursuant to 28 U.S.C. § 1391(b)(1), as the Southern District of New York is the judicial district in which any and all Defendants reside.

19.     Venue is also proper in the United States District Court, Southern District of New York, pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     Each of the Plaintiffs exhausted her administrative prerequisites as may be required for the claims raised herein.

21.     Creighton dual-filed her charge of discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC") on June 9, 2022.

22.     Creighton filed charges of discrimination as to Kafene and JustWorks.

23.     More than 180 days passed without the EEOC having reached a decision.

24.     Accordingly, the EEOC issued a dismissal and notice of rights letter ("DNOR") for Creighton on or about January 19, 2023.  (Exh. 1.)

25.     This lawsuit is brought within 90 days of Creighton's receipt of the DNOR.

26.     During the course of the EEOC's investigation into Creighton's charges of discrimination, Creighton advised the EEOC that "[she] was not sure whether the EEOC alerted Kafene to the possible systemic nature of the investigation…but it occurred to me that

it might be further discrimination/retaliation against women on the whole and/or retaliation for perceived litigation risk." (Exh. 2.)

27.     Accordingly, the EEOC was aware that other women who worked as Area Sales Managers ("ASMs") for the Defendants were being subject to discrimination and retaliation in the workplace and the EEOC had an opportunity to investigate those allegations.

28.     Thus, to the extent Gohsler's claims require exhaustion of administrative remedies, her claims were "piggy-backed" onto the charges of discrimination filed by Creighton and/or Moore and/or Okunami.

29.     Okunami multi-filed her charge of discrimination with the California Civil Rights Commission, Sacramento County Commission on Human Rights, and the EEOC on August 24, 2022.

30.     Okunami filed charges of discrimination as to Kafene and JustWorks.

31.     More than 180 days passed without the EEOC having reached a decision.

32.     Accordingly, the EEOC issued DNORs for Okunami on or about March 27, 2023 as to JustWorks and March 31, 2023 as to Kafene. (Exh. 3.)

33.     This lawsuit is brought within 90 days of Okunami's receipt of the DNOR.

34.     Moore multi-filed her charge of discrimination with the Illinois Department of Human Rights, City of Chicago Commission on Human Relations, Cook County Commission on Human Rights, and the EEOC on July 6, 2022.

35.     Moore filed charges of discrimination as to Kafene and JustWorks.

36.     More than 180 days passed without the EEOC having reached a decision.

37.     Accordingly, the EEOC issued a DNOR for Moore on or about February 17, 2023.  (Exh. 4.)

38.     This lawsuit is brought within 90 days of Moore's receipt of the DNOR.

<u>**INTEGRATED ENTERPRISE ALLEGATIONS**</u>

39.     Kafene is a company that was formed in 2019 to offer merchants financing services for their customers.

40.     Kafene's target market is in lease-to-own consumer goods, including, but not limited to tires, wheels, furniture, appliances, car audio, and mobile telephones.

41.     Specifically, members of the public who wish to obtain goods on a lease-to-own basis from merchants who have an agreement with Kafene (the "Merchants"), will have their financing for those goods processed by Kafene, Kafene will assume the liability for the debt, and the consumer pays the financing fee for the debt to Kafene.

42.     JustWorks is a PEO that has an agreement to provide services for Kafene.

43.     The Plaintiffs were on-boarded for their work with Kafene by JustWorks.

44.     JustWorks creates and maintains Kafene's policies, forms, and handbooks.

45.     JustWorks provided training to individuals who worked for Kafene and issued paychecks to the Plaintiffs, with those paychecks bearing JustWorks' name.

46.     Upon information and belief, JustWorks also makes recommendations to Kafene on hiring, firing, and discipline of individuals performing work for Kafene.

47.     Due to the involvement that JustWorks has in the day-to-day operations of Kafene, JustWorks jointly employed the Plaintiffs.

## RECRUITMENT AND HIRING

48.    In late-2021 to early-2022, Kafene sought out the Plaintiffs to act as sales personnel for its service offering.

49.    Each Plaintiff had a book of existing business and industry contacts that included Merchants who could become clients of Kafene.

50.    Each of the Plaintiffs was contacted by Kafene for the purpose of influencing them to leave their existing sales positions to join Kafene as an ASM.  (Exh. 5.)

51.    Chief Operating Officer and President of Kafene Neal Desai ("Desai") and/or Head of Sales David Bradford ("Bradford") spoke with each of the Plaintiffs as part of the interview process.

52.    During that process, Desai, Bradford, and/or Head of Talent Acquisition Harold Mayer told each of the Plaintiffs that, as ASMs, their designated geographic regions would be protected from intrusion by other ASMs.

53.    This meant that each Plaintiff was promised that her territory would be exclusively hers to make sales in.

54.    The Plaintiffs were also promised that they would receive bonuses based on sales and commission payments on "house accounts."

## CREIGHTON-SPECIFIC FACTS

55.    Creighton is a female who was employed by the Defendants as an ASM.

56.    On November 30, 2021, Creighton accepted the written offer to work as an ASM for Kafene, beginning January 10, 2022, and that offer included a "Sales Commission Policy."  (Exh. 6.)

57.    Creighton attended the "Highpoint Furniture Show" from April 2, 2022-April

6, 2022 where she met a Georgia-based merchant (Grand Furniture) who was interested in Kafene's product.

58.     As there was no ASM assigned to Georgia at the time, Creighton followed-up with the Merchant via email on April 13, 2022.

59.     Dan Laverage ("Laverage"), a male, became the ASM over Georgia, effective April 18, 2022.

60.     Creighton told Bradford that she thought it was fair that Laverage split the account with her since that was his territory and Laverage would have to service the account.

61.     Creighton did, ultimately, get credit for the account, but had to split the commissions with Laverage.

62.     Noel Pagan ("Pagan"), a male, joined Kafene in mid-April 2022 as the ASM in South Florida.

63.     Prior to Pagan joining, that area of Florida was part of Creighton's territory.

64.     Within a month of Pagan joining Kafene, he had tracked an unheard-of volume of sales in his territory/Creighton's prior territory.

65.     As it turned out, this was because Bradford had given Pagan full credit for "house accounts" in the territory.

66.     That is to say that Pagan got full credit for accounts he had not signed up, such as "El Creador," which was an account that a prior ASM had signed-up before leaving Kafene.

67.     Essentially, El Creador had been a "personal account" to the former ASM, but converted to a "house account" that Creighton had to service when that ASM left Kafene.

68.     Creighton did not receive credit or commission for her work on the El Creador

account.

69.    However, when Pagan was assigned the territory upon hire in April/May 2022, the account converted back from a "house account" to a "personal account", with Pagan getting all the credit for El Creador's sales volume.

70.    El Creador's sales volume contributed to Pagan's performance metrics and bonus payouts.

71.    The net result is that Pagan was able to hit his numbers and earn commission (the newly-assigned personal accounts generated $140,000 in volume towards Pagan's numbers in May 2022), while Creighton was treated as if she was not satisfactorily hitting her numbers (Creighton's number in April was about $46,000, while her number in May was only about $88,000).

72.    When Creighton asked Bradford about this on May 18, 2022, she was merely "reminded" that "house accounts" do not contribute to quotas.

73.    In short, Bradford lied.

74.    Recognizing that she was being treated worse that her male counterparts, Creighton filed her initial charges of discrimination on June 9, 2022.

75.    On June 22, 2022, Creighton sent an email to Kafene's Human Resources Director Sosha Furman ("Furman") advising her of the EEOC charge, which Furman acknowledged by way of a response on June 23, 2022.  (Exh. 7.)

76.    After Creighton notified Furman of the EEOC charges, Creighton observed that she no longer had access to what other individuals were doing in "HubSpot," which is a computer program that all account/store originations happen and is the point of reference for any and all communication between Kafene, the merchant, and the Kafene salesperson

working the account.

77.     It had been the practice for ASMs to see other ASM-activity, but Creighton noticed that she could suddenly only view her own account activity.

78.     On July 11, 2022, Creighton observed in HubSpot that 50% of the leads assigned to her had disappeared.

79.     When she asked HubSpot manager Brandon Reis ("Reis") about it, he explained that "many of them were duplicates" and Kafene had "cleaned them up from the computer lead import."

80.     This was not a true statement.

81.     As seen from the example of one lead—Outdoor Décor Store—it was not a duplicate.

82.     It was a lead that had been assigned to Creighton and then was assigned to Francisco Rios, a male.

83.     Because HubSpot visibility had been limited, Creighton could no longer see what activities Rios was engaging in with merchants like the Outdoor Décor Store that had been taken away from her and given to him.

84.     In late-July 2022, Creighton observed that Rios had begun targeting sales prospects in her territory.

85.     Upon information and belief, Bradford was aware of Creighton's charge of discrimination on or before July 20, 2022.

86.     On July 22, 2022, Bradford told Creighton that she would no longer be going to the Las Vegas trade show as scheduled.

87.     She had been going to the trade show each year for about 10 years and had

extensive experience with the national accounts that were represented at the trade show.

88.    Attendance at the trade show ended up being limited to Kafene's male ASMs.

89.    Male ASMs were being allocated extra travel funds, not only to attend the Las Vegas trade show, but to come to Creighton's territory and sign-up Creighton's prospects.

90.    For example, Creighton had a pre-existing relationship with the owner of Tampa Furniture Outlet—a prospect located within Creighton's territory.

91.    Bradford gave the account to Blake Austin, a male ASM ("Austin"), whose territory was Missouri.

92.    Bradford claimed that he was giving Austin credit for the account because Tampa Furniture Outlet was allegedly a referral from someone that Austin knew.

93.    Creighton called Bradford and reminded him of the nine-year relationship she had with the owner.

94.    Creighton advised that she did not feel that giving Austin sole control and credit over an account that was in her territory was good for the business relationship, since she could service it better.

95.    Bradford told Creighton that he would see to it that the account was split between Austin and Creighton, but that never materialized.

96.    When the male ASMs were not getting full sales credit for flat-out poaching Creighton's prospects, Creighton was being made to share the sales credit with the male interlopers.

97.    For example, on July 18, 2022, Creighton had made contact with a Merchant named "Coast 2 Coast Customs" ("C2C") in Jacksonville.

98.    The main office of C2C was in Fort Lauderdale, and Creighton had made plans

to travel to Fort Lauderdale and close the deal.

99.     On July 22, 2022, Pagan signed up C2C.

100.    Bradford told Creighton that she would have to split the credit with Pagan for this Merchant because the main office was in Pagan's territory.

101.    Creighton called Pagan on July 25, 2022 to ask about the recent closing of the C2C deal, whereupon Pagan made a comment that led her to believe that while she did not have access to see the notes of other ASMs in HubSpot, Pagan must still have that access.

102.    On July 26, 2022, as a result of Pagan's comment, Creighton sent an email to Furman with her concerns, including her concern that Pagan may have access to HubSpot, while she did not.

103.    Pagan and Rios and others were using their access to HubSpot to target Creighton's prospects with information that they were able to see about her work efforts in the system.

104.    For example, on July 27, 2022, Creighton observed on the morning's Leaderboard Activity that Rios had been registering activity in Jacksonville, Florida--in Creighton's territory.

105.    Rios's territory was supposed to be limited to Connecticut, Rhode Island, Maine, Iowa, and Mississippi, as shown on the July 8, 2022 territory map.  (Exh. 8.)

106.    "Mattress and Furniture Supercenter" in Tampa had been signed up by Rios before he left in January 2022.

107.    After Rios left, it became a "house account."

108.    Creighton recognized that this merchant was a "Top 10" account and that the relationship was not being fostered.

109.    As such, Creighton reached out to Bradford to tell him that she wanted to meet with the merchant and build the relationship.

110.    Bradford told Creighton that that would be fine and she would get credit for it.

111.    Creighton worked hard to build the relationship with that Merchant and there were many entries into HubSpot to support that.

112.    Nevertheless, Creighton was never given credit for that account.

113.    Instead, Rios's name remained on the account and it was never converted from a "house account" to a "personal account," contrary to Bradford's representation and to the treatment Pagan received when it came the "personal account" of El Creador.

114.    Full access to HubSpot was restored on September 2, 2022 after Kafene's attorneys became aware of the issue on August 31, 2022.

115.    But Creighton was not the only female ASM being subject to this treatment by the Defendants.

## OKUNAMI-SPECIFIC FACTS

116.    Okunami is 64-year-old female who also worked for the Defendants as an ASM.

117.    Like Creighton, Okunami was recruited to work for Kafene, specifically by Alanna Whitmore ("Whitmore").

118.    Whitmore told Okunami that she would have exclusivity of territory, although Kafene was not sure yet what exactly her territory would be.

119.    Okunami had a Zoom interview with Regional Sales Director Garry Gorgei and was supposed to have a follow-up with Bradford, but that never ended up occurring.

120.    On January 18, 2022, Okunami accepted the written offer to work as an ASM for Kafene, beginning February 7, 2022.  (Exh. 9.)

121.    Okunami was also promised an $80,000 salary, but ended up getting paid a $75,000 salary.

122.    In June 2022, Kafene shut down Okunami's largest account—Mattress and Furniture Express in Roseville, California.

123.    Seeing that the discrimination that the other Plaintiffs had experienced was also happening to her, Okunami filed her charges of discrimination on August 24, 2022.

124.    Even though Mattress and Furniture Express was reactivated in early-September, the Defendants shut down the account again in October 2022.

## MOORE-SPECIFIC FACTS

125.    Moore is a female who worked for the Defendants as an ASM.

126.    Like Okunami, Moore was contacted by Whitmore about the ASM position with Kafene.

127.    After Whitmore's correspondence with her, Moore had one Zoom interview with Bradford and a follow-up telephone call with Bradford.

128.    Moore was promised exclusivity in Illinois, which included the virgin market of Chicago, and a $5,000 bonus after six months.

129.    On February 24, 2022, Moore accepted the written offer to work as an ASM for Kafene, beginning March 14, 2022.  (Exh. 10.)

130.    After Moore accepted the written job offer, she quit her job with Acima and moved from Tennessee to Illinois to pursue the opportunity with Kafene.

131.    Upon joining Kafene, Moore gave her Tennessee book of business to ASM Damon Booker.

132.    Moore never received credit for those accounts, the $5,000 bonus, or the market exclusivity she was promised.

133.    During her first month Moore got six new accounts in Chicago.

134.    This allowed her to hit her numbers well.

135.    However, the very next month, Desai told Moore to shut down the Chicago market.

136.    Desai demanded to know who authorized the Chicago market and Bradford told her that she needed to "ease off" the Chicago market.

137.    Without Chicago, Moore could not make her numbers.

138.    Furthermore, Moore was not provided with any additional territories to work despite her largest market (Chicago) being blacked-out.

139.    Meanwhile, Clark Cavaliere, a male ASM, who was assigned Pennsylvania with the blacked-out territory of Philadelphia, was given the New York territory to make-up for the lost prospecting potential.

140.    Moore suggested that she could also take on the then-open territories of Michigan and Iowa to help make-up for the lost Chicago potential.

141.    Bradford denied the request and gave deals that Moore had already closed there to Austin, who had the Missouri territory.

142.    Moore also had three of her accounts deactivated in June 2022: New Age Furniture, Everything Home Furniture, and Dream World Furniture.

143.    As with Tampa Furniture in Creighton's case, Ayat Furniture in Illinois was poached by Austin, despite it being outside his territory.

144.    Not only were her clients being poached and shut down, but Moore never got credit for "house accounts," even though such credit had been promised to her.

145.    Moore asked Bradford how it was that Austin, Pagan, and Jose Formoso, another male ASM, were getting credit for "house accounts," but she was not getting credit.

146.    Bradford only said that it was "apples and oranges" but never elaborated on what that meant.

147.    Seeing the discrimination that she was experiencing, Moore filed charges of discrimination on July 6, 2022.

148.    On July 20, 2022, Bradford called Moore and was very upset.

149.    Bradford brought up issues that had been raised in Moore's EEOC charges, which evidenced his knowledge of the charges and their contents.

150.    That same day, Bradford issued Moore a disciplinary write-up.

151.    On July 22, 2022, there was a text exchange between Moore, Bradford, and Furman about a one-on-one meeting that confirmed that they were aware of her EEOC charges.

152.    Thereafter, like Creighton and Okunami, Moore's access to critical aspects of HubSpot was also cut off.

## GOHSLER-SPECIFIC FACTS

153.    Gohsler is a female who worked for the Defendants as an ASM beginning in August 2021.

154.    During her recruitment discussions for the ASM position, Gohsler was also promised market exclusivity, with her territories to be Virginia, North Carolina, and South Carolina.

155.    Gohsler initially met Kafene's sales expectations.

156.    However, unlike Creighton, Moore, and Okunami, Gohsler had a pre-existing relationship with Bradford.

157.    The Defendants terminated Bradford in the autumn of 2022.

158.    Once Bradford was gone, Gohsler's sales figures started to drop, just like all the other female ASMs.

159.    Without Bradford in a management role to "shield" Gohsler from the Defendants' discriminatory actions, she, too, began to suffer from the pay disparities that Creighton, Okunami, and Moore experienced.

## THE PLAINTIFFS ARE TERMINATED

160.    On Tuesday, November 1, 2022, Creighton, Okunami, and Moore engaged in voluntary mediation with the Defendants in hopes of resolving their discrimination claims that were pending before the EEOC.

161.    The mediation failed.

162.    As such, Creighton, Okunami, and Moore believed it was the appropriate time to file amendments to their respective charges of discrimination to encompass the matters that had occurred since the initial charges were filed.

163.    Creighton, Okunami, and Moore had held off on filing the charges in hopes of reaching a resolution via the mediation.

164.    However, with the mediation failing on November 1, 2022, on Wednesday, November 2, 2022, they filed their amended charges with the EEOC and transmitted those amended charges to the Defendants' management team as a courtesy status update.

165.    Two days later, on Friday, November 4, 2022, the Defendants fired Creighton, Okunami, and Moore.

166.    Gohsler was fired on November 7, 2022.

## DAMAGES

167.    As a direct and proximate result of the unlawful actions of the Defendants described herein, each Plaintiff has suffered damages in the form of lost wages and benefits, lost future opportunities, emotional suffering, and mental anguish.

168.    These injuries are ongoing and reasonably likely to continue into the indefinite future.

169.    Furthermore, as a direct and proximate result of the Defendants' violation of the laws, described herein, each of the Plaintiffs has required the services of undersigned counsel, to whom each Plaintiff is obligated to remit fees and costs.

## COUNT I: SEX-BASED DISCRIMINATION UNDER TITLE VII
## (ALL PLAINTIFFS)

170.    The Plaintiffs reaffirm and reallege paragraphs 1-169, above.

171.    Each of the Defendants is a "covered employer" within the meaning of Title VII as each Defendant engaged in an industry affecting commerce and has had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

172.    Each of the Plaintiffs was a "covered employee" within the meaning of Title VII, who was employed by Kafene and/or JustWorks.

173.    The Defendants have more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year.

174.    During their employment, each of the Plaintiffs experienced sex-based discrimination, in that the Defendants were motivated at least in part, by discriminatory animus.

175.    The Plaintiffs suffered adverse employment actions in the form of lost pay due to the intrusion into their purportedly exclusive territories, lost opportunities for sales and commission, and, ultimately, termination.

176.    The Defendants' unlawful motive is evidenced by a "convincing mosaic" of factors, including the preferential treatment of male ASMs with respect to commissions on "house accounts," the increased travel budgets given to male ASMs, and other indicia of preference for male ASMs over female ASMs, including the Plaintiffs.

177.    However, the discriminatory animus may have also been the sole reason for the Defendants' discriminatory treatment of the Plaintiffs.

178.    The Plaintiffs are in a protected category within the meaning of Title VII by virtue of their sex, female.

179.    The Plaintiffs were all qualified to perform the essential functions of their jobs as ASMs.

180.    Similarly-situated males were treated more favorably than the Plaintiffs in the terms and conditions of their employment with the Defendants.

181.    The Defendants' actions were in reckless disregard for the federally-protected rights of the Plaintiffs to be free from sex-based discrimination.

182.    As a direct and proximate result of the Defendants' unlawful conduct, the Plaintiffs have suffered and continue to suffer harm.

WHEREFORE, the Plaintiffs respectfully demand this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Punitive damages;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of Title VII; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT II: SEX-BASED DISCRIMINATION UNDER FLORIDA CIVIL RIGHTS ACT OF 1992
## (CREIGHTON)

183.    Creighton reaffirms and realleges paragraphs 1-169, above.

184.    Each of the Defendants is and was an "employer" within the meaning of the Florida Civil Rights Act of 1992, as amended, ("FCRA") as it employed 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

185.    Creighton is a "person" within the meaning of the FCRA who was employed by Kafene and/or JustWorks.

186.    During her employment, Creighton experienced sex-based discrimination, in that the Defendants were motivated at least in part, by discriminatory animus.

187.    Creighton suffered adverse employment actions in the form of lost pay due to the intrusion into her purportedly exclusive territory, lost opportunities for sales and commission, and, ultimately, termination.

188.    The Defendants' unlawful motive is evidenced by a "convincing mosaic" of factors, including the preferential treatment of male ASMs with respect to commissions on "house accounts," the increased travel budgets given to male ASMs, and other indicia of preference for male ASMs over female ASMs, including Creighton.

189.    However, the discriminatory animus may have also been the sole reason for the Defendants' discriminatory treatment of Creighton.

190.    Creighton is in a protected category within the meaning of the FCRA by virtue of her sex, female.

191.    Creighton was qualified to perform the essential functions of her job as an ASM.

192.    Similarly-situated males were treated more favorably than Creighton in the terms and conditions of her employment with the Defendants.

193.    As a direct and proximate result of the Defendants' unlawful conduct, Creighton has suffered and continues to suffer harm.

WHEREFORE, Creighton respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the Act; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT III: SEX-BASED DISCRIMINATION UNDER ILLINOIS HUMAN RIGHTS ACT
## <u>(MOORE)</u>

194.    Moore reaffirms and realleges paragraphs 1-169, above.

195.    Each of the Defendants is a "covered employer" within the meaning of the Illinois Human Rights Act ("IHRA") as each Defendant had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

196.    Moore was a "covered employee" within the meaning of the IHRA, who was employed by Kafene and/or JustWorks.

197.    During her employment, Moore experienced sex-based discrimination, in that the Defendants were motivated at least in part, by discriminatory animus.

198.    Moore suffered adverse employment actions in the form of lost pay due to the intrusion into her purportedly exclusive territory, lost opportunities for sales and commission, and, ultimately, termination.

199.    The Defendants' unlawful motive is evidenced by a "convincing mosaic" of factors, including the preferential treatment of male ASMs with respect to commissions on "house accounts," the increased travel budgets given to male ASMs, and other indicia of preference for male ASMs over female ASMs, including Moore.

200.    However, the discriminatory animus may have also been the sole reason for the Defendants' discriminatory treatment of Moore.

201.    Moore is in a protected category within the meaning of the IHRA by virtue of her sex, female.

202.    Moore was qualified to perform the essential functions of her job as an ASM.

203.    Similarly-situated males were treated more favorably than Moore in the terms and conditions of her employment with the Defendants.

204.    The Defendants' actions were in reckless disregard for the legally-protected rights of Moore to be free from sex-based discrimination.

205.    As a direct and proximate result of the Defendants' unlawful conduct, Moore has suffered and continues to suffer harm.

WHEREFORE, Moore respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

   a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

   b.  Front pay or reinstatement;

   c.  Interest on the amounts awarded, consistent with law;

   d.  Nominal damages;

   e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Punitive damages;

g.  Reasonable attorneys' fees and costs;

h.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

i.  Any and all other relief permitted by law deemed just and proper by the Court.

### COUNT IV: SEX-BASED DISCRIMINATION UNDER CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT
### (OKUNAMI)

206.    Okunami reaffirms and realleges paragraphs 1-169, above.

207.    Each of the Defendants is a "covered employer" within the meaning of the California Fair Employment and Housing Act ("FEHA") as each Defendant had five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

208.    Okunami was a "covered employee" within the meaning of the FEHA, who was employed by Kafene and/or JustWorks.

209.    During her employment, Okunami experienced sex-based discrimination, in that the Defendants were motivated at least in part, by discriminatory animus.

210.    Okunami suffered adverse employment actions in the form of lost pay due to the intrusion into her purportedly exclusive territory, lost opportunities for sales and commission, and, ultimately, termination.

211.    The Defendants' unlawful motive is evidenced by a "convincing mosaic" of factors, including the preferential treatment of male ASMs with respect to commissions on "house accounts," the increased travel budgets given to male ASMs, and other indicia of

preference for male ASMs over female ASMs, including Okunami.

212.    However, the discriminatory animus may have also been the sole reason for the Defendants' discriminatory treatment of Okunami.

213.    Okunami is in a protected category within the meaning of the FEHA by virtue of her sex, female.

214.    Okunami was qualified to perform the essential functions of her job as an ASM.

215.    Similarly-situated males were treated more favorably than Okunami in the terms and conditions of her employment with the Defendants.

216.    The Defendants' actions were in reckless disregard for the legally-protected rights of Okunami to be free from sex-based discrimination.

217.    As a direct and proximate result of the Defendants' unlawful conduct, Okunami has suffered and continues to suffer harm.

WHEREFORE, Okunami respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Punitive damages;

g.  Reasonable attorneys' fees and costs;

h.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

i.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT V: AGE-BASED DISCRIMINATION UNDER CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (OKUNAMI)

218.  Okunami reaffirms and realleges paragraphs 1-169 and 207-208, above.

219.  During her employment, Okunami experienced age-based discrimination, in that the Defendants were motivated at least in part, by discriminatory animus.

220.  Okunami suffered adverse employment actions in the form of lost pay due to the intrusion into her purportedly exclusive territory, lost opportunities for sales and commission, and, ultimately, termination.

221.  The Defendants' unlawful motive is evidenced by a "convincing mosaic" of factors, including the preferential treatment of younger ASMs with respect to commissions on "house accounts," the increased travel budgets given to younger ASMs, and other indicia of preference for younger ASMs over older ASMs, including Okunami.

222.  However, the discriminatory animus may have also been the sole reason for the Defendants' discriminatory treatment of Okunami.

223.  Okunami is in a protected category within the meaning of the FEHA by virtue of her age, 64 years old.

224.  Okunami was qualified to perform the essential functions of her job as an ASM.

225.  Similarly-situated younger individuals were treated more favorably than Okunami in the terms and conditions of her employment with the Defendants.

226.  The Defendants' actions were in reckless disregard for the legally-protected

rights of Okunami to be free from age-based discrimination.

227.    As a direct and proximate result of the Defendants' unlawful conduct, Okunami has suffered and continues to suffer harm.

WHEREFORE, Okunami respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Punitive damages;

g.  Reasonable attorneys' fees and costs;

h.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

i.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT VI: RETALIATION UNDER TITLE VII
## (CREIGHTON, OKUNAMI, MOORE)

228.    Creighton, Okunami, and Moore reaffirm and reallege paragraphs 1-169 and 171-173, above.

229.    Creighton, Okunami, and Moore engaged in protected conduct within the meaning of Title VII when they filed their initial charges of discrimination with the EEOC.

230.    Creighton, Okunami, and Moore then experienced adverse actions in the form of lost access to HubSpot, refusal to allow Creighton to attend the Las Vegas sales conference,

the disciplinary actions against Moore, and other deprivations of sales opportunities as described in this Complaint.

231.    There is a causal connection between the protected conduct of the initial charges of discrimination and these adverse actions via the close temporal proximity of the events at the very minimum.

232.    Creighton, Okunami, and Moore again engaged in protected conduct when they amended their charges of discrimination on November 2, 2022.

233.    They suffered an adverse employment action in the form of their termination a mere two days thereafter, on November 4, 2022.

234.    There is a causal connection between the protected activity of filing the amended charges of discrimination with the EEOC and the terminations of Creighton, Okunami, and Moore by virtue of the close temporal proximity at the very minimum.

235.    The Defendants' actions were in reckless disregard for the legally-protected rights of the Plaintiffs to be free from unlawful retaliation.

236.    As a direct and proximate result of the Defendants' unlawful conduct, the Plaintiffs have suffered and continue to suffer harm.

WHEREFORE, the Plaintiffs respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.    Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.    Front pay or reinstatement;

c.    Interest on the amounts awarded, consistent with law;

d.    Nominal damages;

e.  Punitive damages;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

### COUNT VII: RETALIATION UNDER FLORIDA CIVIL RIGHTS ACT OF 1992 (CREIGHTON)

237.    Creighton reaffirms and realleges paragraphs 1-169 and 184-85, above.

238.    Creighton engaged in protected conduct within the meaning of the FCRA when she filed her initial charges of discrimination with the EEOC.

239.    Creighton then experienced adverse actions in the form of lost access to HubSpot, refusal to allow Creighton to attend the Las Vegas sales conference, and other deprivations of sales opportunities as described in this Complaint.

240.    There is a causal connection between the protected conduct of the initial charges of discrimination and these adverse actions via the close temporal proximity of the events at the very minimum.

241.    Creighton again engaged in protected conduct when she amended her charges of discrimination on November 2, 2022.

242.    Creighton suffered an adverse employment action in the form of her termination a mere two days thereafter, on November 4, 2022.

243.    There is a causal connection between the protected activity of filing the amended charges of discrimination with the EEOC and Creighton's termination by virtue of the close temporal proximity at the very minimum.

244.    The Defendants' actions were in reckless disregard for the legally-protected

rights of Creighton to be free from unlawful retaliation.

245.    As a direct and proximate result of the Defendants' unlawful conduct, Creighton has suffered and continues to suffer harm.

WHEREFORE, Creighton respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT VIII: RETALIATION UNDER ILLINOIS HUMAN RIGHTS ACT (MOORE)

246.    Moore reaffirms and realleges paragraphs 1-169 and 195-96, above.

247.    Moore engaged in protected conduct within the meaning of the IHRA when she filed her initial charges of discrimination with the EEOC.

248.    Moore then experienced adverse actions in the form of lost access to HubSpot, the disciplinary actions against Moore, and other deprivations of sales opportunities as described in this Complaint.

249.    There is a causal connection between the protected conduct of the initial charges of discrimination and these adverse actions via the close temporal proximity of the events at the very minimum.

250.    Moore again engaged in protected conduct when she amended her charges of discrimination on November 2, 2022.

251.    Moore suffered an adverse employment action in the form of her termination a mere two days thereafter, on November 4, 2022.

252.    There is a causal connection between the protected activity of filing the amended charges of discrimination with the EEOC and Moore's termination by virtue of the close temporal proximity at the very minimum.

253.    The Defendants' actions were in reckless disregard for the legally-protected rights of Moore to be free from unlawful retaliation.

254.    As a direct and proximate result of the Defendants' unlawful conduct, Moore has suffered and continues to suffer harm.

WHEREFORE, Moore respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.    Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.    Front pay or reinstatement;

c.    Interest on the amounts awarded, consistent with law;

d.    Nominal damages;

e.    Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.    Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT IX: RETALIATION UNDER CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT
## (OKUNAMI)

255.    Okunami reaffirms and realleges paragraphs 1-169 and 207-08, above.

256.    Okunami engaged in protected conduct within the meaning of the FEHA when she filed her initial charges of discrimination with the EEOC.

257.    Okunami then experienced adverse actions in the form of lost access to HubSpot and other deprivations of sales opportunities as described in this Complaint.

258.    There is a causal connection between the protected conduct of the initial charges of discrimination and these adverse actions via the close temporal proximity of the events at the very minimum.

259.    Okunami again engaged in protected conduct when she amended her charges of discrimination on November 2, 2022.

260.    Okunami suffered an adverse employment action in the form of her termination a mere two days thereafter, on November 4, 2022.

261.    There is a causal connection between the protected activity of filing the amended charges of discrimination with the EEOC and Okunami's termination by virtue of the close temporal proximity at the very minimum.

262.    The Defendants' actions were in reckless disregard for the legally-protected rights of Okunami to be free from unlawful retaliation.

263.    As a direct and proximate result of the Defendants' unlawful conduct, Okunami has suffered and continues to suffer harm.

WHEREFORE, Okunami respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

## COUNT X: RETALIATION UNDER FLORIDA WHISTLEBLOWER'S ACT (CREIGHTON)

264.    Creighton reaffirms and realleges paragraphs 1-169 and 239-45, above.

265.    At all times relevant hereto, the Defendants were a private business that employed ten or more persons, and were therefore an "employer" within the meaning of the Florida Whistleblower's Act (the "Act").  Fla. Stat. § 448.101(3).

266.    Creighton was employed by the Defendants for pay and is therefore an "employee" within the meaning of the Act.  Fla. Stat. § 448.101(2).

267.    Creighton engaged in protected activity by objecting to the Defendants' actual violation of law, rule, and/or regulation.

268.    Creighton reasonably believed the Defendants violated Title VII and/or the FCRA and/or the EPA and/or the Act in their disparate treatment of her based on her sex and in their retaliation against her for filing the initial charges of discrimination against the Defendants.

269.    In fact, the Defendants actually did violate one or more of the laws identified above.

270.    These violations were in furtherance of the Defendants' interest, as the Defendants.

271.    As a direct and proximate result of the Defendants' unlawful conduct, Creighton has suffered and continues to suffer harm in the form of lost pay and benefits and loss of the capacity to enjoy life and other mental anguish.

272.    These injuries are ongoing and reasonably likely to continue into the indefinite future.

WHEREFORE, Creighton demands that the Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

**COUNT XI: RETALIATION UNDER ILLINOIS WHISTLEBLOWER ACT
(MOORE)**

273.    Moore reaffirms and realleges paragraphs 1-169 and 108-115, above.

274.    At all times relevant hereto, the Defendants were a private business that employed one or more persons in the state of Illinois and were therefore an "employer" within the meaning of the Illinois Whistleblower Act (the "Whistleblower Act").

275.    Moore is an "employee" within the meaning of the Whistleblower Act, in that she is individual who was employed on a full-time, part-time, or contractual basis by the Defendants.

276.    Moore engaged in "protected conduct" within the meaning of the Whistleblower Act by disclosing information to the EEOC upon having reasonable cause to believe that what she disclosed was a violation of Title VII and/or the IHRA and/or the Whistleblower Act.

277.    Moore then experienced adverse actions in the form of lost access to HubSpot, the disciplinary actions against Moore, other deprivations of sales opportunities as described in this Complaint, and her termination a mere two days after amending her charges of discrimination.

278.    There is a causal connection between the protected activity of filing the charges of discrimination with the EEOC and these adverse actions by virtue of the close temporal proximity at the very minimum.

279.    The Defendants' actions were in reckless disregard for the legally-protected

rights of Moore to be free from unlawful retaliation.

280.    As a direct and proximate result of the Defendants' unlawful conduct, Moore has suffered and continues to suffer harm.

WHEREFORE, Moore respectfully demands this Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

a.  Backpay, including but not limited to, lost wages and benefits to the date of trial;

b.  Front pay or reinstatement;

c.  Interest on the amounts awarded, consistent with law;

d.  Nominal damages;

e.  Compensatory damages for mental anguish, loss of the capacity to enjoy life, and other pain and suffering;

f.  Reasonable attorneys' fees and costs;

g.  Entrance of an injunction prohibiting the Defendants from further violations of the law; and

h.  Any and all other relief permitted by law deemed just and proper by the Court.

### COUNT XII: RETALIATION UNDER CALIFORNIA WHISTLEBLOWER PROTECTION ACT (OKUNAMI)

281.    Okunami reaffirms and realleges paragraphs 1-169, above.

282.    The Defendants are "employers" within the meaning of the California Whistleblower Protection Act ("CWPA").

283.    Okunami was an "employee" of the Defendants within the meaning of the CWPA.

284.    Okunami engaged in "protected conduct" within the meaning of the CWPA by disclosing information to the EEOC upon having reasonable cause to believe that what she disclosed was a violation of Title VII and/or the FEHA and/or the CWPA.

285.    Okunami then experienced adverse actions in the form of lost access to HubSpot, other deprivations of sales opportunities as described in this Complaint, and her termination a mere two days after amending her charges of discrimination.

286.    Okunami's protected conduct was a contributing factor to the Defendants' taking the adverse actions against her.

287.    The Defendants' actions were in reckless disregard for the legally-protected rights of Okunami to be free from unlawful retaliation.

288.    As a direct and proximate result of the Defendants' unlawful conduct, Okunami has suffered and continues to suffer harm.

289.    These injuries are ongoing and reasonably likely to continue into the indefinite future.

WHEREFORE, Okunami demands that the Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

      a.    Compensatory damages, including, but not limited to compensation for physical injury and past, present, and future mental anguish;

      b.    Lost wages;

      c.    Nominal damages;

      a.    Prejudgment and post-judgment interest;

      b.    Punitive damages;

      c.    Penalizing the Defendants with the maximum civil fines permitted by law;

    d.   Reasonable attorneys' fees and costs;

    e.   Entrance of an injunction prohibiting the Defendants from further violations of the law; and

    f.   Any other relief the Court deems just and proper.

### COUNT XIII: BREACH OF CONTRACT
### (ALL PLAINTIFFS)

290.    The Plaintiffs reaffirm and reallege paragraphs 1-169, above.

291.    Creighton, Okunami, and Moore each had a written contract for employment with the Defendants. (Exhs. 6,9, and 10.)

292.    Gohsler had, at minimum, an oral contract for employment with the Defendants.

293.    The Defendants breached each of the Plaintiff's contracts by failing to compensate them in accordance with the requirements of the contracts.

294.    As a direct and proximate result of the Defendants' breach of the Plaintiffs' contracts, each of the Plaintiffs suffered damages.

WHEREFORE, the Plaintiffs demand that the Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

    a.   Monetary damages resulting from the Defendants failure to pay the Plaintiffs the wages and benefits in the amounts required by the contracts;

    b.   Prejudgment and post-judgment interest; and

    c.   Any other relief the Court deems just and proper.

### COUNT XIV: FRAUDULENT INDUCEMENT
### (ALL PLAINTIFFS)

295.    The Plaintiffs reaffirm and reallege paragraphs 1-169, above.

296.    Each of the Plaintiffs were induced to work for the Defendants based on false statements of material fact.

297.    For example, each of the Plaintiffs were told that she would have a protected territory to make sales and that she would receive commissions on "house accounts."

298.    Furthermore, Moore was told that she would be able to make sales in the Chicago market.

299.    These statements were false and made with malicious intent to benefit from the Plaintiffs' reliance on the statements to turn over their books of business to Kafene.

300.    The Defendants knew that these statements were false, as they had no actual intention to protect each Plaintiff's territory from intrusion by other ASMs, to pay out commissions on "house accounts," or to allow Moore to make sales in the Chicago market.

301.    These statements were made for the purpose of and had the actual effect of inducing each of the Plaintiffs to enter into her respective contract for employment with the Defendants.

302.    Had it not been for the Defendants' intentional misrepresentations of fact, the Plaintiffs would not have left their prior places of employment, entered into the contracts for employment with the Defendants, or severed their business relationships with their existing contacts in the field by referring them to Kafene.

303.    As a direct and proximate result of the Defendants' false statements of material fact which induced the Plaintiffs to enter contracts for employment, the Plaintiffs suffered damages, including lost wages and benefits, lost business opportunities, and loss of reputation.

WHEREFORE, the Plaintiffs demand that the Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

    a.   Lost wages and benefits;

    b.   Loss of reputation and other compensatory damages;

    c.   Punitive damages;

    d.   Prejudgment and post-judgment interest; and

    e.   Any other relief the Court deems just and proper.

## COUNT XV: EQUAL PAY ACT OF 1963
### (ALL PLAINTIFFS)

304.    The Plaintiffs reaffirm and reallege paragraphs 1-169, above.

305.    The Defendants are subject to the requirements of the EPA because they are covered enterprises within the meaning of the Fair Labor Standards Act of 1938, as amended.

306.    In particular and at all relevant times, the Defendants regularly engaged in interstate commerce, employed at least two individuals, and had at least $500,000 per year in gross receipts.

307.    The Plaintiffs are all of the female sex and gender.

308.    All of the Plaintiffs were employed by the Defendants as ASMs.

309.    The Defendants employed other ASMs of male sex and gender.

310.    The male ASMs performed substantially the same work as the Plaintiffs and were similarly situated to the Plaintiffs in all relevant respects.

311.    All of the ASMs, male and female, reported to the same manager and performed the same tasks.

312.    However, the male ASMs were paid more than the Plaintiffs, who are female.

313.    The male ASMs, including Austin and Pagan, were permitted to enter into the Plaintiffs' territories, close the sales that the Plaintiffs had been developing, were given

opportunities in markets that were foreclosed to Moore, and given a portion of Creighton's deals.

314.    Kafene's management team knew that the Plaintiffs were not being paid equally and willfully condoned the discriminatory pay practices.

315.    Kafene's management team would flaunt the male ASMs' sales figures at team meetings and authorized additional travel funds for the males to use to steal the Plaintiffs' sales prospects, thereby actively encouraging the sex and gender-based pay disparity.

316.    The Defendants' actions in disparately paying the Plaintiffs compared to their male counterparts were taken bad faith and in reckless disregard for the Plaintiffs' federally-protected rights.

WHEREFORE, the Plaintiffs demand that the Court enter judgment against the Defendants jointly and severally, as may be necessary to effectuate justice, for the following:

  a. Back pay;

  b. Liquidated damages;

  c. Prejudgment and post-judgment interest;

  d. Attorneys' fees and costs; and

  e. Any other relief the Court deems just and proper.

## JURY TRIAL DEMAND

The Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted this 19th day of April, 2023.

/s/ Shaina Thorpe
**SHAINA THORPE**
Florida Bar No. 0055464[1]
Primary: shaina@thorpelaw.net
Secondary: admin@thorpelaw.net

**THORPELAW, P.A.**
1228 East 7th Ave., Ste. 200
Tampa, Florida 33605
Telephone: (813) 400-0229
Fax: (813) 944-5223

*Counsel for Plaintiffs Debra Creighton, Valerie Okunami, Amber Moore, and Kirsten Gohsler*

---

[1] A Motion for Pro Hac Vice status in this Court is being filed contemporaneously herewith.